IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. THUNDER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

WALKER P. THUNDER, APPELLANT.

Filed March 7, 2017.    No. A-15-891.

Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge. Affirmed.

F. Matthew Aerni, of Berry Law Firm, for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

MOORE, Chief Judge, and PIRTLE and RIEDMANN, Judges.

PER CURIAM.

### INTRODUCTION

Walker P. Thunder appeals his convictions for possession of a firearm by a prohibited person and possession of a stolen firearm. On appeal, he argues that guns and ammunition were seized in violation of his constitutional right to be protected from unreasonable searches and seizures and that statements he made to the arresting deputy were obtained in violation of his *Miranda* rights. Upon our review, we affirm.

### BACKGROUND

On December 21, 2013, Deputy Jason Henkel with the Lancaster County Sheriff's Department was on routine traffic patrol on Interstate 80 when he noticed a recreational vehicle

(RV) swerving in its own lane and crossing the shoulder line. Henkel initiated a traffic stop and requested the driver to have a seat in his patrol car.

At the time of the traffic stop, there were four other people in the RV, including Thunder. The driver informed Henkel that the group was heading to New Mexico and Las Vegas. Although the driver initially referred to the passengers as his "friends," he later told Henkel that he could not remember the names of the other people in the RV, aside from his girlfriend and Thunder. When Henkel asked the driver who the other passengers in the RV were, the driver said that they were Thunder's friends who came along because "[Thunder] can't drive." Henkel became suspicious that criminal activity may have been afoot, because the driver did not know the names of his traveling companions and because the driver remained nervous even after Henkel informed him he would be issuing only a warning. Henkel observed that the driver's hands were shaking, his jaw was quivering, and he had labored breathing. Henkel asked the driver whether there were any illegal drugs or guns in the vehicle and the driver replied that there were not.

Henkel then asked the driver for permission to search the RV. The driver responded that Henkel could search the driver's personal luggage, but that he did not feel he could give permission to search the entire RV because it was a rental vehicle. According to the driver, another passenger had signed the rental documents. At that time, a woman exited the RV with a dog. Henkel requested the woman to come back to his patrol car. The woman stated that she was the one who rented the RV and that she did not know the other occupants and had just met them the previous day. The woman seemed nervous, but denied that there were guns or drugs in the RV. Henkel asked the renter for permission to search the RV, and she consented.

Henkel returned to the RV and had the three remaining passengers, including Thunder, exit the vehicle. Henkel informed Thunder and the other passengers that the renter had given permission for him to search the vehicle but did not ask Thunder or the other passengers for permission to search their personal luggage. Neither Thunder nor the other passengers objected to the search. While the passengers and driver stood off to the side of the road with another deputy who had arrived on the scene, Henkel began his search of the RV. Inside the RV's main living area, Henkel observed a black case which he recognized to be a gun case. Henkel opened the gun case and discovered a 9-mm handgun inside. Henkel continued his search and located a .45-caliber handgun and ammunition in a duffle bag.

After discovering the firearms, Henkel exited the RV and asked the RV's occupants who owned the weapons. Thunder admitted they were his. Henkel asked Thunder whether he was a felon, to which Thunder replied, "I got five times drunken driving." Thunder was apparently unsure whether his convictions were felonies. Thunder claimed that he did not know the guns were in the RV and that his brother must have placed them in the RV before the trip.

After determining that Thunder owned the guns, Henkel had Thunder sit in his patrol car. Henkel asked Thunder to spell his name and provide his date of birth, address, phone number, and social security number. Henkel radioed dispatch with Thunder's identifying information in an attempt to determine whether Thunder was, in fact, a convicted felon. Approximately 55 minutes after radioing in Thunder's identifying information, Henkel and the other deputy on the scene also called in the guns' serial numbers. Dispatch confirmed that the 9-mm handgun was stolen. At that point, Henkel read Thunder his *Miranda* rights and placed him under arrest. Henkel later also confirmed that Thunder was a felon.

Henkel transported Thunder to the Lancaster County Sheriff's Office where he again read Thunder his *Miranda* rights. Thunder signed a *Miranda* waiver form. Henkel then interviewed Thunder, and Thunder provided additional information about the guns located in the RV.

Thunder was subsequently charged with one count of possessing a stolen firearm in violation of Neb. Rev. Stat. § 28-1212.03 (Cum. Supp. 2012), a Class III felony, and one count of possession of a firearm by a prohibited person in violation of Neb. Rev. Stat. § 28-1206(3)(b) (Cum. Supp. 2012), a Class ID felony.

Prior to trial, Thunder filed a motion to suppress the guns, ammunition, evidence of his criminal record, and statements he made to Henkel. Following a hearing on the motion, the district court overruled the motion. The court determined that the search of the gun case was constitutional under the plain view exception to the warrant requirement. Specifically, the court found that Henkel was authorized to search the RV because he had received consent from the renter. The court further determined that once Henkel was lawfully in the RV, he observed the gun case and immediately recognized its incriminating nature. Alternatively, the court held that Henkel acted reasonably in believing that the renter possessed common authority over the contents of the RV such that she could consent to a search of Thunder's luggage. With respect to Thunder's statements, the court found no *Miranda* violation. The court concluded that Thunder was not in custody at the time he admitted that the guns were his and that he might be a felon. Thunder filed a motion to reconsider, which the district court overruled.

The case proceeded to a stipulated bench trial. The evidence adduced at the trial consisted primarily of the bill of exceptions from the suppression hearing at which Henkel testified and the recording of the traffic stop from Henkel's patrol car. The State also introduced evidence of Thunder's criminal history which revealed that he was a felon due to a fifth-offense driving under the influence conviction in 2003. Finally, the State introduced a Lancaster County Sheriff's Department additional case information form, which confirmed that the 9-mm handgun had been stolen in 2011.

Thunder objected to all the State's evidence on the basis of the same arguments made in his motion to suppress. The court overruled Thunder's objections and received the State's evidence. Thunder did not present any evidence.

Following the bench trial, Thunder was found guilty of both counts. The district court sentenced Thunder to 2 to 4 years' incarceration for possessing a stolen firearm and 3 to 5 years' incarceration for being a felon in possession of a firearm. The sentences were to be served concurrently. Thunder appeals.

## ASSIGNMENTS OF ERROR

Restated and renumbered, Thunder argues that the district court erred in (1) finding that the RV renter's consent to search the vehicle extended to Thunder's luggage, (2) holding that the gun case's incriminating nature was immediately apparent such that it fell under the plain view exception to the warrant requirement, (3) finding that Thunder consented to a search of his luggage by remaining silent when informed that the renter had given consent to search, (4) finding that Thunder was not in custody prior to being read his *Miranda* rights in the patrol car, and (5) failing to suppress the statements Thunder made after he was taken into custody and before he was Mirandized in the patrol car.

## STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Tyler*, 291 Neb. 920, 870 N.W.2d 119 (2015). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id.*

It is a mixed question of law and fact whether a statement was voluntarily made and whether a custodial interrogation has occurred. *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011). These questions involve the application of the facts surrounding the statement to the constitutional rubric mandated by the U.S. Supreme Court, and are reviewed under the same two-point standard of review set forth above. *Id.*

## ANALYSIS

*Search and Seizure.*

Thunder's first three assignments of error relate to the constitutionality of the search that led Henkel to discover and seize the 9-mm handgun in the gun case and the .45-caliber handgun and ammunition in the duffle bag. Thunder asserts that the district court erred in denying his motion to suppress because the renter lacked the authority to consent to a search of his luggage, his silence did not amount to consent to search his luggage, and the plain view doctrine does not apply under the facts of this case. We conclude that the plain view exception to the warrant requirement does apply, and therefore, the court did not err in denying Thunder's motion to suppress.

A warrantless seizure is justified under the plain view doctrine if (1) a law enforcement officer has a legal right to be in the place from which the object subject to seizure could be plainly viewed, (2) the seized object's incriminating nature is immediately apparent, and (3) the officer has a lawful right of access to the seized object itself. *State v. Reinpold*, 284 Neb. 950, 824 N.W.2d 713 (2013). Here, Thunder does not contest the first and third elements, and we find they are satisfied by the facts of this case. Instead, Thunder solely argues that the gun case's incriminating nature was not immediately apparent, because Henkel was not aware of Thunder's criminal history or status as a felon prior to the search.

In order for an object in plain view to be seized, the incriminating nature of the property must be immediately apparent. *State v. Reinpold, supra*. For an object's incriminating nature to be immediately apparent, the officer must have probable cause to associate the property with criminal activity. *Id.* Probable cause is a flexible, commonsense standard. *Id.* It merely requires that the facts available to the officer would warrant a person of reasonable caution in the belief that certain items may be useful as evidence of a crime. *Id.*

The probable cause standard, with regard to the plain view doctrine, does not demand any showing that a belief that certain items may be useful as evidence of a crime be correct or more likely true than false. *Id.* See also *U.S. v. Weinbender*, 109 F.3d 1327 (8th Cir. 1997) (probable cause demands not that officer be "sure" or "certain" but only that facts available to reasonably cautious man would warrant belief that certain items may be contraband or stolen property or

useful as evidence of crime). Ultimately, satisfaction of the probable cause standard may leave the reporting officer with further need to investigate the items seized in order to confirm the incriminating nature of those items. *State v. Reinpold, supra*.

In the present case, the traffic stop occurred on Interstate 80, on which there is a high frequency of illegal activity, according to Henkel's testimony. Henkel's suspicions were arisen initially based on his interactions with the driver and renter. During those conversations, Henkel learned that the occupants were traveling across the country but did not all know each other. Henkel testified that it was "odd" for them to be traveling cross-country without even knowing each other's names. In addition, the driver and renter each appeared very nervous, more so than Henkel normally sees during a traffic stop. When talking with the driver, Henkel noticed that the driver's hands were shaking, his jaw was quivering, and he had labored breathing. And Henkel noted that the driver's nervousness did not subside when Henkel informed him he was only going to issue a warning, as it generally does with people who are not involved in criminal activity. To the contrary, the driver's nervousness remained elevated and appeared to increase throughout his encounter with Henkel. Henkel suspected the parties may be involved in criminal activity and actually informed the driver that he thought there might be some criminal activity afoot. Henkel asked both the driver and renter whether there were any narcotics or weapons in the RV, and both parties denied the presence of any drugs or guns in the vehicle.

We conclude, under the facts of this case, that the incriminating nature of the gun case was immediately apparent, because Henkel had probable cause to associate guns with criminal activity at the time the case was located in the RV. We reiterate that the "immediately apparent" language does not require that Henkel knew that a gun in the RV constituted contraband or evidence of a crime at the time he located the case; rather, it merely requires that the facts available to him would warrant a man of reasonable belief that it may be contraband, stolen property, or useful as evidence of a crime. See *Texas v. Brown*, 460 U.S. 730, 103 S. Ct. 1535, 75 L.Ed.2d 502 (1983).

The fact that the item seized is not inherently incriminating does not defeat the requirement that the incriminating nature be immediately apparent. The Nebraska Supreme Court has held that satisfaction of the probable cause standard may leave the reporting officer with further need to investigate the items seized in order to confirm the incriminating nature of those items. See *State v. Reinpold*, 284 Neb. 950, 824 N.W.2d 713 (2013). In addition, the Seventh Circuit Court of Appeals has upheld the seizure of innocuous objects based on the totality of the circumstances surrounding the location of the property. Officers may have probable cause to seize an ordinarily innocuous object when the context of an investigation casts that item in a suspicious light. *United States v. Cellitti*, 387 F.3d 618 (7th Cir. 2004). See also *United States v. Bruce*, 109 F.3d 323 (7th Cir. 1997) (summarizing cases where none of items seized, including empty ammunition box, large amount of money, and money and maps, was inherently incriminating, but in connection with crime being investigated, each item took on suspicious nature, giving officers probable cause to seize it).

In the instant case, Henkel was suspicious that the parties may be involved in transporting drugs. The driver and renter appeared unusually nervous, and the parties were unfamiliar with each other, traveling across the country, in a rented vehicle with out-of-state license plates. The Eighth Circuit Court of Appeals has recognized an officer's testimony that out-of-state license plates can be indicative that the vehicle is a rental being used for drug trafficking to make detection and

identifying the occupants more difficult. See *U.S. v. Coleman*, 603 F.3d 496 (8th Cir. 2010). Here, the driver and renter also claimed there were no guns in the RV, despite one of the guns Henkel located appearing in plain view when he searched. The Eighth Circuit has held that hidden guns, even badly hidden guns, are by their nature incriminating, *U.S. v. Hatten*, 68 F.3d 257, (8th Cir. 1995), and that guns are "tools of the trade" for drug dealers, *U.S. v. Regans,* 125 F.3d 685, 686 (8th Cir. 1997). Thus, the totality of the circumstances supports a conclusion that Henkel had probable cause to suspect that the gun case may contain contraband or evidence of a crime when he located it in plain view.

Having determined that Henkel had probable cause to seize the gun case, we turn to his authority to search it without a warrant. Because Thunder does not argue this prong of the test, we summarily discuss it solely for purposes of completeness. The Eighth Circuit Court of Appeals has upheld the warrantless search of a gun case that was readily identifiable as such. See *U.S. v. Banks*, 514 F.3d 769 (8th Cir. 2008). The court stated:

> Ordinarily, a warrant is necessary before police may open a closed container because by concealing the contents from plain view, the possessor creates a reasonable expectation of privacy. *Robbins v. California,* 453 U.S. 420, 427, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), *overruled on other grounds by United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). However, like objects that sit out in the open, the contents of some containers are treated similarly to objects in plain view. In *Arkansas v. Sanders* [442 U.S. 753, 99 S.Ct. 2586 (1979), *overruled on other grounds by United States v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982 (1991)]*,* the Court suggested that no warrant is required to open such containers: "some containers (for example . . . *a gun case*) by their very nature cannot support a reasonable expectation of privacy because their contents can be inferred from their outward appearance."

*Id*. at 773.

Here, Henkel testified that he recognized the case as being a gun case; therefore, Thunder could not have a reasonable expectation of privacy in it because once Henkel lawfully seized it, its contents could be inferred. See also *State v. Vyhnalek*, 19 Neb. App. 904, 814 N.W.2d 768 (2012) (concluding that because container was single-purpose container warrant was not required before officers opened gun case).

Thunder's argument focuses on the fact that Henkel did not know he was a felon when he searched the gun case and that it is not unlawful to transport a gun. We recognize that the Eighth Circuit in *dicta* has expressed concern that officers who seized ammunition during a search of a suspect's residence did so without any knowledge that the suspect was a convicted felon. See *U.S. v. Blom*, 242 F.3d 799 (8th Cir. 2001). The court rejected, in *dicta*, the notion that an officer could seize a citizen's firearms or ammunition with no knowledge of that citizen's criminal history and then attempt to justify the seizure because, in hindsight, it turns out the citizen is a convicted felon. In the present case, however, Henkel did not seize the guns because of a belief that one of the RV's occupants may be a convicted felon. Rather, he reasonably believed that the gun may be connected to drug activity, and as we determined above, that belief is supported by probable cause. We therefore conclude that the totality of the circumstances supports a finding that the incriminating

nature of the 9-mm handgun was immediately apparent, because Henkel had probable cause to associate it with criminal activity upon discovery. Accordingly, the district court did not err in denying Thunder's motion to suppress with respect to the 9-mm handgun. Because the 9-mm handgun alone supports Thunder's convictions for possession of a stolen firearm and possession of a firearm by a prohibited person, we do not address the search of Thunder's duffle bag which led to the location of the .45-caliber handgun and ammunition. In addition, because we find that the motion to suppress was properly denied under the plain view doctrine, we need not address Thunder's arguments as to whether the renter could consent to a search of Thunder's luggage or whether Thunder acquiesced to the search based on his silence.

Miranda *Rights.*

Thunder's final two assignments of error relate to the statements Thunder made to Henkel before being read his *Miranda* rights. On appeal, Thunder no longer argues that his statements prior to being placed in the patrol car should be suppressed. Rather, Thunder argues that he was subject to custodial interrogation without *Miranda* warnings when he was seated in Henkel's patrol car and that his statements, including his name, address, date of birth, phone number, and social security number, should have been suppressed. We find no merit to Thunder's assignments of error.

*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements stemming from the custodial interrogation of a defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *State v. Dallmann*, 260 Neb. 937, 621 N.W.2d 86 (2000). Thus, in order to safeguard an uncounseled individual's Fifth Amendment privilege against self-incrimination, suspects interrogated while in police custody must be apprised of certain rights. *Id.*

A person is in custody for purposes of *Miranda* when there is a formal arrest or a restraint on one's freedom of movement to the degree associated with such an arrest. *State v. Bormann*, 279 Neb. 320, 777 N.W.2d 829 (2010). Interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Id.*

The Nebraska Supreme Court has drawn a distinction between custodial interrogation requiring *Miranda* warnings and preliminary investigation not triggering such protections:

> [T]he *Miranda* decision distinguished preliminary investigation from custodial interrogation. *Miranda* applies only to interrogations initiated by law officers after a person has been taken into custody or deprived of his freedom in any significant way. The [*Miranda*] procedures . . . were not meant to preclude law enforcement personnel from performing their traditional investigatory functions such as general on-the-scene questioning. . . . Thus, [i]n on-the-scene investigations the police may interview any person not in custody and not subject to coercion for the purpose of determining whether a crime has been committed and who committed it.

*State v. Holman*, 221 Neb. 730, 736, 380 N.W.2d 304, 309 (1986) (internal quotation marks omitted) (citations omitted).

For example, in *Holman*, an officer stopped the defendant for a missing license plate and observed four large tires in her open trunk. *Id.* The officer asked the defendant who owned the tires and she admitted they were not hers, but declined to name the owner. The officer also asked the defendant for her license and registration, which she provided. The officer ran a registration and warrants check and learned that the defendant's license had been suspended and that there was a warrant for her arrest. The officer then arrested the defendant. She was later prosecuted for receiving stolen property. On appeal, the defendant contended that her statements to the officer regarding the tires should have been suppressed because she had not been read her *Miranda* rights at the time. The Supreme Court determined that suppression was not required because the officer was simply engaging in on-the-scene questioning and the defendant was not in custody at the time.

Similarly, in *State v. Bowers*, 250 Neb. 151, 548 N.W.2d 725 (1996), the Nebraska Supreme Court found that *Miranda* warnings were not required during an on-the-scene investigation. The officer had stopped the defendant's vehicle for missing license plates and in-transit tags. The officer smelled alcohol upon approaching the car. The defendant was able to produce paperwork showing that he had recently purchased the car, but he failed to produce a driver's license. The defendant claimed that he had recently had his license reinstated. The officer asked the defendant to accompany him back to his police cruiser to verify his story regarding his driver's license and to determine if the smell of alcohol emanated from the defendant. The defendant sat in the front seat of the cruiser and the officer had him perform routine field sobriety tests, which the defendant failed. The court determined that the defendant was not in custody during the investigation.

Likewise here, Henkel was involved in a preliminary, on-the-scene investigation to determine whether a crime had been committed at the time he asked Thunder questions in his patrol car. Similar to the officers in *Holman, supra*, and *Bowers, supra*, Henkel asked Thunder only for basic information to verify his identity in an attempt to determine whether a crime (being a felon in possession of a firearm) had been committed. Thunder was not in custody at the time he made these statements. The district court did not err in failing to suppress Thunder's statements.

## CONCLUSION

We find no error in the district court's denial of Thunder's motion to suppress and determination that no *Miranda* violation occurred. We therefore affirm.

AFFIRMED.